UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

ERIC D. CONNER,

    Plaintiff,

Case No.: 17-cv-00948

v.

STACY L. HOEM, NATHAN BETHEL,
SANDY MCARDLE, ANGELA MINK,
SCOTT RUBIN-ASCH, and
JOLINDA J. WATERMAN,

    Defendants.

## DECLARATION OF SANDRA MCARDLE

Defendant Sandra McArdle, declares as follows under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am an adult resident of the State of Wisconsin and a named defendant in the above-captioned action. I base this declaration on my personal knowledge of the facts and circumstances attested to herein and my review of the relevant, regularly kept records of the Wisconsin Department of Corrections ("DOC"), including the inmate correctional health care records of the plaintiff, Eric Conner.

2. I have been a nurse practitioner since February 1999. I received a Masters in Nursing from the University of South Carolina in June 1998. I am licensed as both a registered nurse and an APNP through the State of Wisconsin. I am also board certified as a family nurse practitioner through the American Nurses Credentialing Center. At all times relevant to this matter, and to this day, I have been contracted with Maxim Physician Resources, LLC as an

advanced practice nurse prescriber ("APNP"). I have been working at Wisconsin Secure Program Facility ("WSPF") as an APNP on a locum tenens assignment since January 2017.

3. Prior to working to WSPF, I worked as an APNP at Oakhill Correctional Institution. Before working at Oakhill Correctional Institution, I worked primary care APNP, I worked as an urgent care APNP in the ER, and I also provided APNP services in underserved areas, like Indian Health Services and the Department of Defense.

4. I have the proper training, education, and experience to provide APNP care to WSPF inmates, including Mr. Conner.

5. As required and as is my personal practice, I made a record within an inmate correctional health care record of all health care contacts I had with patients at WSPF. To confirm my independent recollections, I reviewed the correctional health care records maintained by WSPF for Mr. Conner for the time period at issue in this case. Attached hereto as Exhibit A is a true and accurate copy of portions of the complete correctional health care records maintained by DOC and WSPF for Mr. Baker. Based upon my experience in providing APNP services at WSPF, these records are made at or near the time of the event, by or from information transmitted by the person with knowledge or the event, as a regular practice of the medical professional in keeping an accurate medical record for the patient.

6. I am familiar with and have reviewed the Amended Complaint filed by Mr. Conner on September 29, 2017. I am familiar with Mr. Conner and his history at WSPF.

7. In the Department of Corrections, I do not provide Psychological Services Unit ("PSU") services. Psychological care is only provided by certified mental health providers. While I have training in mental health treatment, there is a division of job duties between PSU and the Health Services Unit. If an inmate presents with thoughts of self-harm, my duties are to rule out any physiological reasons why a person is feeling the need to self-harm, whether it be

2
302355639v1 1006812

from being too tired, medications, or other various physiological reason for thoughts of self-harm.

8. Prescription medications are not authorized to be kept on an inmate's person while in observation status, but can be provided to an inmate by HSU staff.

9. I do not have authority in my role as a nurse practitioner at WSPF to provide personal property to an inmate on clinical observation status or to reverse a restriction of the personal possession of medication, medicated creams and lotions, or any personal property for that matter, for an inmate while on clinical observation status. That decision is made by both PSU and Security.

10. Before Mr. Conner was placed on clinical observation status, I saw Mr. Conner on January 4, 2017. On that date, Mr. Conner complained of cracking skin on his feet and keloids on the back of his head and neck after the area was shaved, and knee pain. Mr. Conner did not have pain when he rotated his left knee and there was no increased warmth in his knee, demonstrating that there was likely no swelling in his knee. Mr. Conner had two raised 1 centimeter keloid bumps on the back of his head which were not warm to the touch, suggesting a lack of infection. He also had dry cracked skin on his feet. I diagnosed him with dry skin, callous on his foot, keloids on the back of his neck, and knee pain. He was prescribed minerin cream, PRN, which means "as needed", a pumice stone for his feet if allowed by security or else to be used at the HSU, bacitracin ointment as needed for his keloids, but we also discussed possible injections, and ordered an x-ray and physical therapy for his knee pain.

11. I personally did not hear from Mr. Conner again regarding his keloids until approximately March 2018. Because the keloids were not serious or endangering Mr. Conner's health, the choice was left to Mr. Conner on when and how to treat the keloids and for him to initiate treatment.

12. I saw Mr. Conner again on February 14, 2017 and April 7, 2017 for issues unrelated to the claims asserted in this lawsuit. I also wrote orders for him on February 2, 9, and March 7, 2017, which were also unrelated to the claims in this lawsuit.

13. On those dates, Mr. Conner did not complain about not receiving his medicated creams or lotions, dry skin or feet, or his keloids on the back of his neck.

14. In the event Mr. Conner would have complained about not having received his medicated creams or lotions, dry skin or feet, or problems with keloids on the back of his neck, I would have made a record of his complaint and my response to his complaint

15. I saw Mr. Conner on April 7, 2017 for complaints of generalized body aches. Mr. Conner was also concerned the trays he was receiving in clinical observation were lower in calories than the regular trays. I recommended use of ibuprofen or lidocaine cream as needed for complaints of generalized body aches, I planned to check on the calories being provided in clinical observation trays versus regular meal trays because Mr. Conner's weight was 11 pounds less than what it was in January 2017, but Mr. Conner was not underweight. His Body Mass Index ("BMI") was 30. I found that Mr. Conner was receiving about the same amount of calories as the regular trays. I later determined that about the same amount of calories are provided, but different meals are provided as the inmate is not able to use utensils to eat the food to prevent of self-harm.

16. On that date, Mr. Conner did not complain about having pain in his feet, dry or cracked skin, or problems with keloids on the back of his neck.

17. In the event Mr. Conner would have complained about having pain in his feet, dry or cracked skin, or problems with keloids on the back of his neck, I would have made a record of his complaint and my response to his complaint. I make very thorough notes in order to keep detailed records of care.

18. On April 7, 2017, Mr. Conner did not present with a serious, urgent, or emergent need.

19. The next time I saw Mr. Conner was on June 7, 2017, when he requested a basin to soak his feet. I provided him with the basin to soak his feet and prescribed a pumice stone as needed.

20. I did not have authority to provide Mr. Conner with access to any medicated creams or lotions while he was on clinical observation status. I further did not see or treat Mr. Conner while he was on clinical observation status, other than the dates referenced above.

21. When the Health Services Unit ("HSU") receives Health Service Requests ("HSR") from inmates, nurses will triage and determine whether the nurse can handle, whether I as the APNP should handle, or whether the HSU Manager, Jolinda Waterman, should handle. Just because the HSR is addressed to me, does not mean that I am aware of it or reviewed it.

22. In reviewing the exhibits attached to Mr. Conner's Motion for Summary Judgment (ECF No. 33-1), I did not respond to any of the HSR's that Mr. Conner addressed to me while he was in clinical observation status from February 2017 to April 2017, as other nurses and Jolinda Waterman responded.

23. I was not personally involved in providing Mr. Conner with out-of-cell access to creams and lotions while he was on clinical observation status. Nurses handle providing inmates with care on while on clinical observation status. I only saw Mr. Conner when he scheduled an appointment with me regarding a specific issue while in clinical observation.

24. Despite the fact that Mr. Conner was not allowed to personally possess creams and lotions, I am aware that HSU made sure to offer creams and lotions to Mr. Conner when needed. Sometimes, when offered, Mr. Conner would refuse.

25. Upon information and belief, there was no point when I was informed that Mr. Conner was suffering from bleeding from his feet or keloids.

26. In my practice, if an inmate presented with serious or concerning issues, I would assess the patient and determine if he required transportation for evaluation in the emergency room.

27. Based upon my professional judgment and expertise, and to a reasonable degree of medical certainty, Mr. Conner was provided with appropriate medical care and has not been denied medical care or accommodations resulting in further injury or pain.

28. All of the testimony I provide in this declaration is provided to a reasonable degree of nursing certainty, based on my professional education, training and experience.

> PURSUANT TO 28 USC § 1746, I VERIFY UNDER PENALTY OF PERJURY THAT THE STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT AND BASED UPON MY PERSONAL KNOWLEDGE.

Dated this 17th day of August, 2018.

/s/ *Sandra McArdle*
Sandra McArdle

6
302355639v1 1006812