United States District Court
Eastern District Of Wisconsin

Eric D. Conner,
        Plaintiff,     "REPLY"

V.                Case No. 17-CV-948

Stacy L. Hoem, Angela Mink,
Scott Rubin-Asch, Prison Psychologist
Providers; Jolinda Waterman
and Nathan Bethel, Prison
medical Providers,
             Defendants.

Plaintiff's "REPLY" To Defendants'
Proposed Findings Of Facts.

Defendants' (PFOF) - Paragraphs: 1-32

Plaintiff's Reply Paragraphs: 1-32

Dated this 21st day of August, 2018.

Eric D. Conner
# 420475
Pro se - Litigant

W. S. P. F.
P. O. Box 1000
Boscobel, WI 53805
(608) 375-5656

United States District Court
Eastern District Of Wisconsin

Eric D. Conner,

Plaintiff, Case No. 17-CV-948

V. Mag. Judge David E. Jones

Stacy L. Hoem, ET AL.,

Defendants.

## Plaintiff's "REPLY" To Defendants' Proposed Findings Of Facts.

I, Eric Conner, Pro se Plaintiff, declare under Penalty Of Perjury Statute, 28 U.S.C. § 1746, that Plaintiff's (REPLYS) to the defendants' Proposed Findings Of Facts are true and correct and based on my Personal Knowledge and experience. Plaintiff rewrites the defendants Proposed Findings Of Fact Verbatim and replys as follows:

1) - Eric Conner (DOC#420475) has been housed at the Wisconsin Secure Program Facility (WSPF) Since September 20, 2016. (Ray Decl. Par. 4.)

Eastern District Of Wisconsin

Response: No dispute

2.) - Stacy Hoem is employed by the Wisconsin Department of Corrections (Department) as a Licensed Psychologist at WSPF. She has held this position since September 7, 2006. (Hoem Decl. Par. 2.)

Response: NO Dispute

3.) - Scott Rubin-Asch is employed by the Department as a Psychologist Supervisor at WSPF. He been employed in this position since March 20, 2017. Dr. Rubin-Asch was also the Psychologist Supervisor at WSPF from September 2006 until September 2011. (Rubin-Asch Decl. Par. 2.)

Response: NO Dispute.

4.) - Angela Mink is employed by the Department as a Psychological Associate at WSPF and so at times relevant to this case. (Dkt. #16 Pars. 3-4; Berg Decl. Ex. 1001, at 21-27.)

Response: NO Dispute.

5.) - Jolinda Waterman is employed by the

(2)

Department as the Health Services Manager (HSU Manager) at WSPF. She has held this position since January 2015 and has been employed at WSPF since 2002. (Waterman Decl. Par. 2.)

Response: NO Dispute.

6.) – Nathan Bethel is currently employed by the Department as a Nurse Clinician at Oak-hill Correctional Institution and has held this position since July 10, 2017. Prior to his current position, he was a nurse clinician at WSPF, and began his employment there in August 2015. (Bethel Decl. Par. 2.)

Response: NO Dispute.

7.) – Conner was placed in Observation Status from February 13, 2017 to March 2, 2017, and again from March 3, 2017 to April 20, 2017. (Hoem Decl. Pars. 5, 16; Berg Decl. Ex. 1001, at 16, 52.)

Response: NO Dispute

8.) – Observation Status is a very restricted status used to protect inmates from harming

themselves or others. The Primary purpose
of Observation Status is to closely monitor
the inmate to ensure his well-being and pre-
vent Suicide. (Hoem Decl. Pars. 6, 14.).

Response : NO Dispute

9.) — Inmates in Observation Status generally
have very limited property and are not allowed
to have Prescription medications. Medications
and medical treatments are provided by HSU
Staff. (Hoem Decl. Pars. 8, 10.)

Response : NO Dispute as to
the very limited property items inmates are allowed
to have in cell; Such as, Medication Containers.
However, Conner never requested nor ever
argued that he wanted to Possess the actual
Containers in-cell while in Clinical Observat-
ion Status. Rather, Conner wanted to have
access to his Prescribed Medicated Creams/Lotion
during medication pass while theter to the
door and or pulled out of cell for treatment.
(PPFOF at Par. 3, Ex #7.)

10.) — PSU Staff determine what property
inmates on Observation Status are allowed

(4)

to have, while requests for medications and
medical treatments are handled and provided
by HSU Staff. (Hoem Decl. Par. 10.)

Response : No Dispute.

11.) - On February 17 and 18, 2017, while in
Observation Status for trying to hang him-
self, Conner used his medicated creams and
lotions to cover his Observation Cell Camera.
(Berg Decl. Ex. 1000, at 5; DKt. 33-1: 5.)

Response : No Dispute as to
using "Minerin Cream" (foot cream) only, not lotion
to cover his (Conners) Camera. Furthermore,
disputes that it was twice. (PPFOF at Par. 2,
Ex#5.) Afterwards, Conner was still allowed
to receive his Creams/Lotion during medication
passes. (PPFOF at Par. 3, Ex# 7)

12.) - The primary purpose Of Observation Status
is to visually monitor the inmate to ensure
his well-being and prevent his suicide or other
serious self-harm. (Hoem Decl. Par. 6.)

Response : No dispute, but
provides that unite Staff not only uses
the Camera to visually monitor inmates

they also Conduct 15-minute Clinical Obser-
vation Checks and document their Observation
of inmates on DOC-112 & Doc-112 A. (PPFOE
Exhibits #5-10; and DOC-27 Forms- (PPFOE Ex.#
1,2,33,34.)

13.) - Conner had a history of Suicide attempts,
including trying to Jump off the ledge of an upper
teir in a County Jail in 2008, and a demostrated
present intent to Kill himself, as evidenced by the
attempted hangings that led to the observation
placements, as well as a threat to hang himself
on February 28, 2017. (Berg Decl. Ex. T001, at
2,14,17, 50; Ray Decl. Ex. 1003, at 7.)
          Response : NO Dispute.

14.) - Allowing an inmate with Conner's
history of Suicide attempts to Cover his
Camera presents a Serious risk of death
to the inmate. (Hoem Decl. Pars... 13-14.)
          Response : Disputes. Unit
Staff and PSU Staff Conducts 15 minute
at-cell front Checks to observe an inmate's
activities, and Covering one's in-cell Camera
doesn't present a Serious risk of death

(6)

to the inmate because staff could still visually observe the inmate at cell-front during 15-minute checks. (PPFOF Ex.#5-10; DOC-27 Forms Ex.# 1, 2, 33, 34.)

15.) - On March 2, 2017, Conner was released from observation status. Nursing staff wrote Conner, explaining that he could be allowed to have his creams and lotions since he was being released from observation. (Berg Decl. Ex. 1001, at 16; Ex. 1000, at 8-9.)

        Response: No Dispute.

16.) - On March 3, 2017, Conner was placed back on observation status after another attempted hanging. (Hoem Decl. Par. 5; Berg Decl. Ex. 1001, at 17; Ray Decl. Ex. 1002, at 1.)

        Response: No Dispute.

17.) - During Conner's March 3, 2017 observation status placement, Dr. Hoem placed a handwritten restriction on Conner's cell door stating that he was

not allowed to have his creams and lotions in his cell. (Hoem Decl. Par. 12.)

    Response : NO Dispute as to Dr. Hoem placing handwritten restriction on Conner's door. Disputes that it only stated not allowed creams/lotion in-cell. In fact, it also stated, "Per Dr. Hoem, Inmate is not allowed to have creams/lotion unless it will cause death without". (SCC Par... 9 )

18.) - The restriction put in place by Dr. Hoem was for Conner's safety because of his history of misusing the lotion to cover his camera and his present intent and desire to kill himself. (Hoem Decl. Par. 13.)

    Response : Disputes. The rest- riction was put into place because Mr. Conner returned to Clinical Observation status after just being released from that status by Dr. Hoem on March 2, 2017, at 4:10 p.m. (SCC Par... 6.) Futhermore, after Mr. Conner misused his cream not lotion to affix toilet paper to his camera so he could use the bathroom, Conner was still able

to receive his creams/lotion by alternative means during his First Clinical Observation placement. (PPFOF. Pars... 1-6; Ex.# 1, 5, 7, 6, 4, 11.) Further, Conner has no history of utilizing his creams/lotion For self-harm and Dr. Hoem never placed a restriction on Conner during his First Observation when he misused his cream to cover camera.

19.) - The Handwritten note on Conner's cell door was used because Dr. Hoem did not want security staff or unit staff allowing Conner to possess his creams and lotions in Observation Status if he asked ~~for~~ For them. Conner refused to talk to PSU Staff throughout his Observation placements, but could later talk to Security Staff and unit staff, requesting more property. (Hoem Decl. Pars... 12-13; Berg Decl. Ex. 100, at 19.)

Response: Disputes. The Handwritten restriction Dr. Hoem placed on Conner's door so that staff could deny Conner his medicated creams/lotion during medication passes and because

(9)

Eastern District Of Wisconsin

Conner returned to Observation Status after she released him. (PPFOF. Par. 13; S.C.C. Dkt# 16 at Par. 9.). Infact an Officer wrote in the DOC-112 that, "Per PSU, Inmate does not get Creams/Lotion. (PPFOF. Par. 14, Ex# 8.)

20.) – By March 15, Conner's Feet were dry, cracked, and peeling. (Waterman Decl. Par. 7; Berg Decl. Ex. 1000, at 7, 14.)

    Response : Disputes that his feet were only dry, cracked and peeling. That Conner also had deep lascerations that bleed. (PPFOF. Par. 17.)

21.) – Conner's dry, cracking and peeling skin on his feet was not considered a serious medical need, as the medication lotions and creams had been prescribed only as needed. (Waterman Decl. Par. 11.)

    Response : Disputes. A provider at WCI and WSPF- Ms. McArdle diagnosed Conner with having dry skin, feet, etc.... and prescribed medicated creams and lotion to treat the diagnosis and to stop the pain, discomfort and risk of infection

(10)

and or Physical Injuries. (SCC·DKT#16·at Pars.
... 29-31 ; (PPFOE·DKt#32 at Pars. ..18,20.)

22.) - Making Sure Conner did not Kill himself
was a much larger Concern, so Waterman
did not Feel it was medically necessary or
appropriate to override the restriction put in
place by PSU Staff. (Waterman Decl·Par...9;
Hoem Decl·Par..8; Berg Decl·Ex·1000, at
22.)

   Response : Disputes. Waterman
Could have provided Conner with immediate
out-of-cell treatment; thus, overriding Dr
Hoem's restriction as Conner received
on March 15, 2017. (PPFOF·DKt#32·Par.
20.) Further, Conner had no history of
Self-harming with his medicated Creams
or lotions. (DPFOF at Par..13.)

23.) - Conner had a history of serious
Suicide attempts, had made recent attempts,
and he refused to even talk to PSU Staff
while on observation, which severely limited
their ability to effectively assess his mental
health and the precise risk he presented to

(11)

Eastern District Of Wisconsin
himself. (Hoem Decl. Par. 7; Rubin-Asch Decl
Pars... 6,14; Berg Decl. Ex. 1001, at 20.)
Response: No Dispute.

24.) - Initially, PSu Staff appropriately and
reasonably played it safe by limiting the property
Conner could possess due to his history of self
harming behaviors. (Hoem Decl. Par. 19; Berg
Decl. Ex 1001, at 17.)
Response: Diputes. Conner's
argument has always been that he didn't
request or ever wanted to possess the
acutal bottles of his creams and lotion.
Rather, have access to it by alternative
means during medication possess and or
out-of-cell treatment as he was receiving
during his First Observation placement.
(PPFOF DKT # 32 at Pars... 1-6) Futhermore,
PSu Staff Kept returning Conner's Smock
after he would attempt self-harm with
it. Therefor, defendants assertion that they
limited Conner's property by playing it safe
is incorrect and meirtless. Conner's safety
was not of concern. (Hoem Decl. Par. 15.)

(12)

Eastern District Of Wisconsin

25.) - A Few weeks into the March obser-
vation placement, on March 15, Conner Stopped
Health Services Manager (HSM) Waterman
to discuss his dry Feet. Waterman observed
Conner's Feet were dry, cracked, and peeling.
(Waterman Decl. Par. 7.)

Response : Disputes that
it was on March 15, that Conner Spoke
to Ms. Waterman and that his Feet was
only dry, cracked, and peeling. Conner has
always claimed that he Spoke to Ms.
Waterman between March 11-12, 2017;
and that he also had deep lascerations at
the bottom of his Feet that bleed, along
with complaining about his dry skin and
Keloids. (SCC. Dkt #16 at Par. 16-19; PPFOF
Dkt #32 at Pars. 17; In which Ms. Waterman
admitted to. (Defendants' Answer to Plaintiff's
Amended Complaint Page 4 at Par. 16.)

26.) - Waterman did not have Supplies to
provide Foot Care at the time She was made
aware of the issue on March 15, 2017, and
his Condition was not so urgent that imm-
ediate care was needed. (Waterman Decl.

(13)

Eastern District Of Wisconsin

Pars... 10, 11.)

Response: Disputes. Mr. Conner only spoke to Ms. Waterman once on or between March 11-12, 2017, and not on March 15, 2017. (SCC Dkt.#16 at Pars... 16-19; PPFOF Dkt.#32. Par..17.) But only spoke with Nurse Bethel on March 15, 2017 at 8:00 a.m. (SCC. Dkt.#1B par... 20, 21; PPFOF Dkt.#32. at par...19.). No dispute as to Waterman not having the Supplies with her, but state that She, an RN as well, Could have pulled Conner Out-of-Cell for treatment.

27.) - Waterman discussed the issue with Nurse Bethel in HSU, who had seen Conner earlier that day, and directed nursing staff to start offering Conner foot care each day to accommodate Conner's Concerns about his feet. (Waterman Decl. Pars... 10, 14; Berg Decl. Ex. 1000, at 14.).

Response: Disputes. (Berg's Decl. Ex. 1000, at 14.) Shows that at 8:00 a.m. Conner seen Nurse Bethel at HSU Station. Conner expressed his Concerns to this RN, and stated that he will notify the

(14)

HSM. (Bethel Decl. Page 5 at Par. 8, 9.) Shows that Bethel was going to speak to Ms. Water man about Conner Concerns. Nurse Bethel was the one who touch base with Ms. Water man on March 15, 2017; in which Conner received Foot Care treatment 5 hours later. (Berg Decl. Ex. 1000, at 15-21.).

Ms. Waterman has changed her date from March 11-12, 2017, to March 15, 2017, to try and cover up her deliberate indifference to Conner's medical needs between March 11-12, 2017.

28.) - From March 15 on, Conner received Foot Care at his request. He refused offers of Foot Care on several occasions, including March 16, 17, 19, 22, 23, 24, 26 and April 3. (Waterman Decl. Par. 15; Bethel Decl. Pars. 11, 12; Berg Decl. Ex. 1000, at 14-21.)

Response : No Dispute. However, States that Conner refused Foot Care on several occasions due to not having sandles, crocs, shoes, socks, etc... means to protect his feet. The cream will come right off the bottom

of his Feet and onto the Cold cement
Floor, making Conner's Feet dry again
immediately. Conner was never provided
with any type of Footwear and was Forced
to walk bare Foot on a Cold Cement Floor
24/7.

29.) — Conner abused his special medical
accomodation by acting inappropriately
While Female nursing Staff were providing
Foot Care. (Rubin-Asch Decl. Par. 9; Berg
Decl. Ex. 1000, at 23.).
                    Response: Disputes.
Inmates on Clinical Observation Status
are not given underwear and or pants.
All Conner had on was a Small black
Sleeveless Smock. Therefor, as the
Nurse could bend down to wash and
Clean Conner's Feet she seen Conner's
genitals by accident. (Exhibit # 1000,
at 23 - dated: 3-31-17 at 1530 hrs. does
not State that Conner masterbated to
this Nurse while receiving Footcare
treatment nor Could the defendants
produce any document From the Nurses

(16)

## Eastern District Of Wisconsin

or Correctional Officers present Stating
Conner masterbated to the female
Nurses while receiving Foot Care treat-
ment as Rubin-Asch and Berg claim in
their declarations.

30.) — Since Conner was acting inapprop-
riate with female nursing staff who were
applying his creams, Waterman and Psu
Supervisor Dr. Rubin-Asch decided to
give Conner another chance to have his
lotions and creams in his cell, with a
warning that they could be taken away if
he misused them in any way. (Rubin-
Asch Decl. Par. 9; Berg Decl. Ex. 1001,
at 42.)

      <u>Response</u> : Disputes : As
Stated above in Conner's response to
DPFOF No. 29.) The incident where
nursing seen Conner's genitals while
bend down Cleaning his feet was not
intentional but an accident. Had Conner
had underwear on She could've never
seen Conner's genitals. This is the
only incident where this happened and

is the only (Exhibit # 1000, at 23) document the defendants produce or can to support their assertion that Conner was acting inappropriate. Their decision to allow Conner access to his creams/lotion was not based on this isolated incident. Futhermore, Conner has never abused his creams/lotion during his 2nd (3-3-17 to 4-20-17) observation placement, but still was covering his camera with toilet paper and water, not creams/lotion.

31.) - Conner did not complain to the defendants about keloids on his neck or elsewhere, as opposed to dry feet, during the relevant time. (Waterman Decl. Par... 16; Bethel Decl. Par... 13.)

Response: Disputes. Conner did complain to Nurse Bethel about his keloids on March 3, 2017, days after; See. Dkt #16 at Par. 12-14.); PPFOF Dkt.# 32 at Pars... 15, 16, 19, 21, 22; Defendants responses to PPFOF paragraphs 15, 16, 19, 21, 22, defendants don't dispute that Conner spoke with Nurse Bethel, but that they don't know the

nature of the Conversations. Futhermore, Conner Complained and Showed Ms. Waterman on or between March 11 2017 to March 12, 2017, his and about Keloids. (SCC DKt. #16. at Pars... 16, 17, 18, 19; PPFOF DKt #32 at Par.. 17.). Also, Conner Complained to Ms. McArdle on April 7, 2017. (SCC DKt. #16 at Pars... 26-30; PPFOF. DKt #32 at Par... 26.)


32.) - On April 7, 2017, an appointment was Scheduled with Nurse Practittioner McArdle at which he could discuss with her any Con-cerns he had about any Skin issues. (Berg Decl. EX. 1000, at 23, 25.)

 Response: NO Dispute. but Further add that this Scheduled appointment was in response to the multipal requests on DOC-3035 Forms Conner was Submitting to HSU dept. requesting to see McArdle For Skin lotion, etc....

 In Fact, the defendants doesn't dispute that Conner Complained to McArdle at this April 7, 2017, hearing/appointment about his Keloids, Feet, and Skin and that She Failed/reFused to document Conner's

Complaints. See- Defendants' Response to
PPFOF Dkt #32 - response # 26.


Dated this 21st day of August, 2018


Eric D. Conner
#420475
W.S.P.F.
P.O. Box 1000
Boscobel, WI 53805
(608) 375-5656
Pro Se-Plaintiff-Respondent

(20)